IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA

Case Number:1:18-CV-03956

ROOR INTERNATIONAL BV and
SREAM, INC.

               Plaintiffs,

v.

BAPSHREE LLC d/b/a XPRESS TOBACCO
OUTLET and DINESHKUMAR PATEL

               Defendants.
_____/

## COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

The Plaintiffs, ROOR INTERNATIONAL BV and SREAM, INC., (collectively referred to as the "Plaintiffs"), by and through their undersigned counsel, hereby file this, their Complaint against the Defendants, BAPSHREE LLC d/b/a XPRESS TOBACCO OUTLET (hereinafter referred to as "XPRESS TOBACCO OUTLET") and DINESHKUMAR PATEL (hereinafter referred to as "PATEL"), and allege, as follows:

### Jurisdictional Allegations

1.      This is a civil action against the Defendants for trademark infringement, counterfeiting, and false designation of origin/unfair competition, under the Lanham Act (15 U.S.C. § 1051 *et. seq.*).

2.      This Court has subject matter jurisdiction over the claims in this action that relate to trademark infringement, counterfeiting, and false designation of origin and unfair competition pursuant to the provisions of 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331 and 1338(a).

3.      This Court has personal jurisdiction over the Defendants because XPRESS TOBACCO OUTLET is incorporated in and has its principal place of business in Indiana, PATEL resides in Indiana, and the Defendants regularly conduct and solicit business in the State of Indiana (including in this Judicial District).

## Venue

4.      Venue is proper in this district under 28 U.S.C. § 1391(b) in that the Defendants reside in this district, a substantial part of the events or omissions giving rise to the claim occurred in this district, and the Defendants are subject to personal jurisdiction in this Judicial District with respect to this action, and there is no other district in which the action may otherwise be brought.

## Parties

5.      RooR International BV (hereinafter referred to as "RooR Int'l") is a Foreign corporation that is incorporated in the Netherlands and has its principal place of business at Sint Nicolaasstraat 19, 1012 NJ, Amsterdam.  RooR Int'l is the registered owner of the "RooR" trademark.

6.      Sream, Inc. (hereinafter referred to as "Sream") is a corporation incorporated in California and has its principal place of business at 12869 Temescal Canyon Road, Suite A, Corona, California, 92883.  Sream is the exclusive U.S. licensee authorized to use the trademark "RooR" and has been granted authority by the trademark owner to police and enforce the RooR trademark within the United States.

7.      XPRESS TOBACCO OUTLET is a corporation that is incorporated in Indiana, and has its principal place of business at 438 S Range Line Road, Carmel, IN 46032.  XPRESS TOBACCO OUTLET has engaged in the unlawful manufacture, retail sale, and/or wholesale

sales of counterfeit RooR branded water pipes and related parts.

8.     At all times material to this Complaint, PATEL owned, managed, and/or operated XPRESS TOBACCO OUTLET, and regularly exercised the authority to purchase products for resale, decide which products XPRESS TOBACCO OUTLET offered for sale, to hire and fire employees, and controlled the finances and operations of XPRESS TOBACCO OUTLET.

**Facts Common to All Counts**

A.    The History of The RooR Brand.

9.     Martin Birzle is an award-winning designer and manufacturer of smokers' products. Based in Germany, since 1995, Mr. Birzle marketed and sold products using the trademark "RooR." The RooR branded products, such as borosilicate jointed-glass water pipes, parts, and accessories related thereto, are widely recognized internationally and are highly renowned for their ornate and innovative characteristics. Indeed, the RooR brand is one of the leading companies in the industry, and has garnered numerous awards and recognition for its innovative products and designs.

10.    For nearly two decades, Mr. Birzle worked to distinguish the RooR brand as the premier manufacturer of glass water pipes by emphasizing the brand's unwavering use of quality materials and focusing on scientific principles which facilitate a superior smoking experience. RooR branded products embody a painstaking attention to detail, which is evident in many facets of authentic RooR branded products. It is precisely because of the unyielding quest for quality and unsurpassed innovation that RooR branded products have a significant following and appreciation amongst consumers in the United States and internationally.

11.    As a result of the continuous and extensive use of the trademark "RooR," Mr. Birzle was granted valid and subsisting federal statutory and common law rights to the RooR

trademark.  Mr.  Birzle then assigned to RooR Int'l all the rights associated with the RooR trademark, retroactively.  The retroactive assignment to RooR Int'l was duly recorded with the United States Patent and Trademark Office on January 10, 2018.  A copy of the assignment recordation is attached hereto as Exhibit "A."

12.    RooR Int'l is the owner of United States trademarks which are registered on the Principal Register and have become incontestable within the meaning of Section 15 of the Lanham Act, 15 U.S.C. § 1065.  The following is a list of RooR Int'l's federally registered and common law trademarks:

a.    U.S. Trademark Registration Number 3,675,839 for the word mark "RooR" and its logo in association with goods further identified in registration in international class 034.

b.    U.S. Trademark Registration Number 2,307,176 for the word mark "RooR" and its logo identified below in association with goods further identified in the registration in international classes 025 and 034.

c.    U.S. Trademark and Registration Number 2,235,638 for the word mark "RooR" and its logo identified below in association with goods further identified in the registration in international class 021.

d.    Common law and unregistered state law rights in the following variants of the registered "RooR" trademarks:



(hereinafter collectively the "RooR Marks"). A copy of the USPTO registrations is attached hereto as Exhibit "B."

B. <u>The RooR Brand in the United States</u>.

13.    Sream is a California corporation that has manufactured glass products and various smokers' articles, including water pipes, for nearly a decade.  Additionally, since 2013, Sream has been the exclusive licensee for the RooR Marks within the United States.

14.    Pursuant to a licensing agreement between Sream and Mr. Birzle (hereinafter the "License Agreement"), Sream has used the RooR Marks in commerce throughout the United States continuously since 2013, in connection with the manufacturing of smokers' products.  See License Agreement attached hereto as Exhibit "C."

15.    RooR Int'l, as the current owner of the RooR Marks, ratified the License Agreement under the same terms and conditions on March 7, 2018.  A copy of the ratification agreement is attached here to as Exhibit "D."

16.    Under the License Agreement, Sream also advertises, markets, and distributes water pipes, parts, and accessories related thereto and other smokers' articles in association with the RooR Marks.  All of these activities are conducted in accordance with the highest standards and policies maintained by RooR Int'l to control the quality of the RooR Brand.

17.    Also pursuant to the License Agreement, Sream has been granted all rights to sue to obtain damages and injunctive relief for past and future infringement of the RooR Marks in the United States (hereinafter the "Enforcement Rights").  The License Agreement provides that the Enforcement Rights granted to Sream under the License Agreement are tantamount to those of an assignee, as contemplated by trademark law.  The License Agreement also appoints Sream as the trademark owner's legal representative to police and enforce all rights in the RooR Marks

within the United States. See License Agreement attached hereto as Exhibit "C."

18.     The RooR Marks are distinctive to both the consuming public and the Plaintiffs' trade. Sream's RooR branded products are made from superior materials – glass that is nearly unbreakable – and are hand-blown by individual artists. RooR Int'l has maintained, and demanded of Sream, the same standards that made RooR a recognizable high quality brand. The superiority of RooR branded products is not only readily apparent to consumers, who yearn for the RooR brand's higher quality glass in the marketplace, but to industry professionals as well. The unique style and functional superiority of the RooR brand has earned it accolades in leading trade magazines and online publications and has made the RooR Marks synonymous with high quality products.

19.     Since 2013, Sream has worked in conjunction with Mr. Birzle and now RooR Int'l to build significant goodwill in the RooR brand in the United States. Together, the Plaintiffs have spent substantial time, money, and effort in developing consumer recognition and awareness of the RooR brand via point of purchase materials and displays, through their websites, by attending industry trade shows, and through social media promotion. A wide array of websites, magazines, and specialty shops include advertising of RooR branded products, which are immediately identifiable.

20.     Sream sells its products under the RooR Marks to its authorized distributors in the United States, including in Indiana. Sream has over a thousand authorized distributors nationwide which include retail stores specializing in smoker's products. As such, RooR branded products reach a vast array of consumers ranging from the most sophisticated tobacco connoisseurs to novice smokers.

21.     It is because of the recognized quality and innovation associated with the RooR

Marks that consumers are willing to pay higher prices for genuine RooR branded products.  For example, a RooR brand 45 cm water pipe retails for $300 or more, while a non-RooR branded product of equivalent size will usually sell for less than $100.  As such, sales of products bearing the RooR Marks in the United States have been in excess of five million dollars ($5,000,000) for the last three years.

22.    It is exactly because of their higher sales value that RooR branded products are targeted by counterfeiters.  These unscrupulous people and entities tarnish the RooR brand by unlawfully selling water pipes that have identical, or nearly identical, versions of the RooR Marks affixed to products that are made with inferior materials and technology.  Thereby leading to significant illegitimate profits by store owners, such as the Defendants.  In essence, the Defendants mislead consumers by offering them low grade products that free ride on the goodwill of the RooR brand, and in turn, the Defendants reap substantial ill-gotten profits.  The Defendants' conduct contributes to the complete flooding of the marketplace with counterfeit products, which results in lost sales and damages to the Plaintiffs and irreparable harm to the RooR brand's image.

23.    Unfortunately, the current U.S. marketplace is saturated with counterfeit products – like those the Defendants have offered for sale.  As such, the Plaintiffs have been forced to scrupulously enforce their rights in order to protect the RooR Marks against infringement.  By exercising its Enforcement Rights, Sream, with the cooperation of RooR Int'l, has proactively and successfully policed the unauthorized use of the RooR Marks and/or counterfeit RooR branded products nationwide.  The Plaintiffs have had to bear great expense to seek out and investigate suspected counterfeiters in their attempt to clean up the marketplace.  In many instances, the Plaintiffs have had to seek redress from the courts in order to effectuate to enforce

their rights in the RooR Marks.

**Defendants' Counterfeiting and Infringing Activities**

24.     The Defendants have, without consent of the Plaintiffs, offered to sell within the United States, including within this judicial district, water pipes that were neither made by the Plaintiffs nor by a manufacturer authorized by the Plaintiffs (hereinafter the "Counterfeit Good(s)").  Nevertheless, the Defendants offered for sale, in commerce, Counterfeit Goods using reproductions, counterfeits, copies and/or colorable imitations of one or more of the RooR Marks (hereinafter the "Infringing Mark"). Photos of the Defendants' offer for sale of counterfeit RooR products is attached hereto as Exhibit "E."

25.     XPRESS TOBACCO OUTLET used the RooR Marks by offering for sale unauthorized copies of RooR branded products.  XPRESS TOBACCO OUTLET's offer for sale of Counterfeit Goods bearing the Infringing Mark in this manner was and is likely to cause confusion or to cause mistake and/or deceive consumers who purchase the Counterfeit Goods.

26.     PATEL authorized, directed, and/or participated in XPRESS TOBACCO OUTLET's offer for sale, in commerce, of Counterfeit Goods bearing the Infringing Mark. PATEL's acts were a moving, active, and/or conscious force behind XPRESS TOBACCO OUTLET's infringement of the RooR Marks.

27.     The Defendants' use of the Infringing Mark began long after Mr. Birzle obtained the trademark registrations alleged above, and after Sream's license and subsequent adoption and use of the RooR Marks. Neither the Plaintiffs nor any authorized agents have consented to the Defendants' use of the RooR Marks, or any use of reproductions, counterfeits, copies and/or colorable imitations thereof.

28.    The Defendants used images and names identical to or confusingly similar to the RooR Marks, to confuse customers and aid in the promotion and sales of Counterfeit Goods under the Infringing Mark.

29.    The Infringing Mark affixed to the Counterfeit Goods that the Defendants have offered for sale is confusingly identical or similar to the RooR Marks that Sream affixes to its water pipes.

30.    The water pipes the Defendants offer for sale and sells under the Infringing Mark are made of substantially inferior materials and inferior technology as compared to genuine RooR brand products.

31.    XPRESS TOBACCO OUTLET has offered for sale, under the authority, direction and/or participation of PATEL, its water pipes under the Infringing Mark through its retail store specializing in smoker's products.

32.    XPRESS TOBACCO OUTLET has offered for sale its Counterfeit Goods under the Infringing Mark through point of purchase displays.

33.    The Defendants' infringing acts as alleged herein are likely to cause confusion, mistake, and deception among the relevant consuming public as to the source or origin of the Counterfeit Goods offered for sale by the Defendants, and are likely to deceive the relevant consuming public into mistakenly believing that the Counterfeit Goods offered for sale by XPRESS TOBACCO OUTLET originate from, are associated or affiliated with, or are otherwise authorized by RooR Int'l and/or Sream.

34.    XPRESS TOBACCO OUTLET's acts are willful with the deliberate intent to trade on the goodwill of the RooR Marks, cause confusion and deception in the marketplace, and divert potential sales of authentic ROOR water pipes to XPRESS TOBACCO OUTLET.  At a

minimum, XPRESS TOBACCO OUTLET was intentionally blind to the likelihood of confusion.

35.    PATEL actively, knowingly, and intentionally adopted and used the Infringing Marks with the intent to trade on the goodwill of the RooR Marks, cause confusion and deception in the marketplace, and divert potential sales of authentic ROOR water pipes to the Defendants.

36.    PATEL's acts were a moving, active, and conscious force behind XPRESS TOBACCO OUTLET's infringement of the RooR Marks.

37.    PATEL personally engaged in tortious conduct within the state of Indiana.

38.    The Defendants' acts are causing and, unless restrained, will continue to cause damage and immediate irreparable harm to the Plaintiffs, the RooR Marks, and to its valuable reputation and goodwill with the consuming public for which the Plaintiffs have no adequate remedy at law.

39.    As a proximate result of the unfair advantage accruing to the Defendants' business from deceptively trading on the Plaintiffs' advertising, sales, and consumer recognition, the Defendants have made and will continue to make substantial profits and gains to which they are not in law or equity entitled.

40.    The injuries and damages sustained by the Plaintiffs have been directly and proximately caused by XPRESS TOBACCO OUTLET's wrongful offers for sale, authorized by PATEL, of their goods bearing infringements or counterfeits of the RooR Marks.

41.    The Defendants' offer for sale of Counterfeit Goods under the Infringing Mark has resulted in lost business opportunities, customers, contracts, and sales to the Plaintiffs.

42.    Through such business activities, the Defendants purposefully derived direct benefits from its interstate commerce activities by targeting foreseeable purchasers in the State of

Indiana, and in doing so, have knowingly harmed the Plaintiffs.

43.     By its wrongful conduct, the Defendants have traded upon and diminished the goodwill of the RooR Marks.  Furthermore, the offer for sale of Counterfeit Goods by XPRESS TOBACCO OUTLET, authorized by PATEL, has infringed upon the above-identified federally registered trademarks.

44.     The spurious marks or designations used by the Defendants in interstate commerce are identical with, or substantially indistinguishable from, the RooR Marks on goods covered by the RooR Marks. Such use therefore creates a false affiliation between the Defendants and the Plaintiffs, and the RooR Marks.

45.     Due to the actions of the Defendants, the Plaintiffs have been forced to retain the undersigned counsel, and the Defendants is responsible for paying its reasonable costs of the action.

46.     The Defendants' acts have damaged, and will continue to damage the Plaintiffs, and the Plaintiffs have no adequate remedy at law.

47.     The Defendants' wrongful acts will continue unless enjoined by the Court. Accordingly, the Defendants must be restrained and enjoined from any further counterfeiting or infringement of the RooR Marks.

**Count One**
**Federal Trademark Counterfeiting and Infringement, 15 U.S.C. § 1114**

48.     The Plaintiffs repeat and reallege paragraphs 1 through 47 hereof, as if fully set forth herein.

49.     RooR Int'l is the owner of the federally registered RooR Marks, as set forth in more detail in the foregoing paragraphs.  Mr. Birzle, as prior owner of the RooR Marks, granted to Sream an exclusive license to use the RooR Marks in the United States, including the

Enforcement Rights to obtain injunctive and monetary relief for past and future infringement of the RooR Marks. RooR Int'l ratified Sream's License Agreement after acquiring the RooR Marks from Mr. Birzle.

50. The RooR Marks are valid, protectable, and distinctive trademarks that Mr. Birzle and now RooR Int'l continuously used to promote its goods for almost two decades, of which Sream has participated in since at least 2013. The relevant purchasing public recognizes the RooR Marks as originating from and/or approved by RooR Int'l and/or its exclusive U.S. licensee, Sream.

51. The Defendants, without authorization from the Plaintiffs, have used in commerce spurious designations that are identical with, or substantially indistinguishable from, the RooR Marks on goods covered by the registrations for the RooR Marks.

52. The Defendants' unauthorized use of counterfeit marks of the registered RooR Marks on and in connection with XPRESS TOBACCO OUTLET's offers for sale in commerce, under the authorization, direction and/or participation of PATEL, is likely to cause confusion or mistake in the minds of the public and, in particular, tends to, and does, falsely create the impression that the water pipes offered for sale by XPRESS TOBACCO OUTLET originated with, are authorized, sponsored or approved by Sream and/or RooR Int'l when, in fact, it is not.

53. The Defendants' unauthorized use of the RooR Marks as set forth above is likely to: (a) cause confusion, mistake and deception; (b) cause the public to believe that the water pipe offered for sale by XPRESS TOBACCO OUTLET is the same as Sream's water pipes or that the water pipes offered for sale by XPRESS TOBACCO OUTLET are authorized, sponsored, or approved by Sream and/or RooR Int'l, or that the Defendants are affiliated, connected, or associated with or in some way related to Sream and/or RooR Int'l; and (c) result in the

Defendants unfairly benefiting from the Plaintiffs' advertising and promotion, and profiting from the reputation of the Plaintiffs and the RooR Marks, all to the substantial and irreparable injury of the public, the Plaintiffs and the RooR Marks and the substantial goodwill represented thereby.

54.    XPRESS TOBACCO OUTLET's conduct as alleged herein is willful and is intended to, and is likely to, cause confusion, mistake, or deception as to the affiliation, connection, or association of XPRESS TOBACCO OUTLET, with the Plaintiffs or the RooR Marks.

55.    PATEL actively, knowingly, and intentionally adopted and used the Infringing Marks with the intent to trade on the goodwill of the RooR Marks, cause confusion and deception in the marketplace, and divert potential sales of authentic ROOR water pipes to the Defendants.

56.    PATEL's acts were a moving, active, and conscious force behind XPRESS TOBACCO OUTLET's infringement of the RooR Marks.

57.    PATEL personally engaged in tortious conduct within the state of Indiana.

58.    The Defendants' acts constitute willful trademark infringement in violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114.

59.    The Defendants' actions constitute the use by the Defendants of one or more "counterfeit mark" as defined in 15 U.S.C. § 1116(d)(1)(B).

60.    The Defendants' use in commerce of the counterfeit RooR Marks has resulted in lost profits to the Plaintiffs which are difficult to determine, caused considerable damage to the goodwill of the Plaintiffs and the RooR Marks, and diminished the brand recognition of the RooR Marks by introducing counterfeit products into the marketplace.

61.     By reason of the foregoing, the Plaintiffs are entitled to, among other relief, injunctive relief, an award of statutory damages, and costs of the action under Sections 34 and 35 of the Lanham Act, 15 U.S.C. §§ 1116, 1117, together with prejudgment and post-judgment interest.

<div align="center">

**Count Two**
**Federal Trademark Counterfeiting, 15 U.S.C. § 1116(d)**

</div>

62.     The Plaintiffs repeat and reallege paragraphs 1 through 47 hereof, as if fully set forth herein.

63.     RooR Int'l is the owner of the federally registered RooR Marks, as set forth in more detail in the foregoing paragraphs.  Mr. Birzle, as prior owner of the RooR Marks, granted to Sream an exclusive license to use the RooR Marks in the United States, including the Enforcement Rights to obtain injunctive and monetary relief for past and future infringement of the RooR Marks. RooR Int'l ratified Sream's License Agreement after acquiring the RooR Marks from Mr. Birzle.

64.     The RooR Marks are valid, protectable, and distinctive trademarks that Mr. Birzle and now RooR Int'l continuously used to promote its goods for almost two decades, of which Sream has participated in since at least 2013. The relevant purchasing public recognizes the RooR Marks as originating from and/or approved by RooR Int'l and/or its exclusive U.S. licensee, Sream.

65.     The Defendants, without authorization from the Plaintiffs, has used spurious designations that are identical with, or substantially indistinguishable from, the RooR Marks on goods covered by the registrations for the RooR Marks.

66.     The Defendants' unauthorized use of the RooR Marks on and in connection with XPRESS TOBACCO OUTLET's offers for sale in commerce, under the authorization, direction

and/or participation of PATEL, of water pipes through its retail store constitutes XPRESS TOBACCO OUTLET's use of the RooR Marks in commerce.

67.    XPRESS TOBACCO OUTLET's conduct as alleged herein is willful and is intended to, and is likely to, cause confusion, mistake, or deception as to the affiliation, connection, or association of XPRESS TOBACCO OUTLET, with the Plaintiffs or the RooR Marks.

68.    PATEL actively, knowingly, and intentionally adopted and used the Infringing Marks with the intent to trade on the goodwill of the RooR Marks, cause confusion and deception in the marketplace, and divert potential sales of authentic ROOR water pipes to the Defendants.

69.    PATEL's acts were a moving, active, and conscious force behind XPRESS TOBACCO OUTLET's infringement of the RooR Marks.

70.    PATEL personally engaged in tortious conduct within the state of Indiana.

71.    The Defendants' actions constitute trademark counterfeiting in violation of Section 32 of the Lanham Act, 15 U.S.C. § 1116(d)(1)(B).

72.    The offer for sale of counterfeit products by XPRESS TOBACCO OUTLET, under the authorization, direction and/or participation of PATEL, has resulted in lost profits to the Plaintiffs, caused considerable damage to the goodwill of the Plaintiffs and the RooR Marks, and diminished the brand recognition of the RooR Marks by introducing counterfeit products into the marketplace.

73.    By reason of the foregoing, the Plaintiffs are entitled to, among other relief, injunctive relief, an award of statutory damages, and costs of the action under Sections 34 and 35

of the Lanham Act, 15 U.S.C. §§ 1116, 1117, together with prejudgment and post-judgment interest.

## Count Three
## Federal False Designation of Origin and Unfair Competition, 15 U.S.C. § 1125(a)

74.    The Plaintiffs repeat and reallege paragraphs 1 through 47 hereof, as if fully set forth herein.

75.    RooR Int'l is the owner of the federally registered RooR Marks, as set forth in more detail in the foregoing paragraphs.  Mr. Birzle, as prior owner of the RooR Marks, granted to Sream an exclusive license to use the RooR Marks in the United States, including the Enforcement Rights to obtain injunctive and monetary relief for past and future infringement of the RooR Marks. RooR Int'l ratified Sream's License Agreement after acquiring the RooR Marks from Mr. Birzle.

76.    The RooR Marks are valid, protectable, and distinctive trademarks that Mr. Birzle and now RooR Int'l continuously used to promote its goods for almost two decades, of which Sream has participated in since at least 2013. The relevant purchasing public recognizes the RooR Marks as originating from and/or approved by RooR Int'l and/or its exclusive U.S. licensee, Sream.

77.    The Defendants, without authorization from the Plaintiffs, have used spurious designations that are identical with, or substantially indistinguishable from, the RooR Marks on goods covered by the registrations for the RooR Marks.

78.    The Defendants' unauthorized use of counterfeit marks of the registered RooR Marks on and in connection with XPRESS TOBACCO OUTLET's offers for sale, under the authorization, direction and/or participation of PATEL, is likely to cause confusion or mistake in the minds of the public and, in particular, tends to, and does, falsely create the impression that

the water pipes offered for sale by XPRESS TOBACCO OUTLET originated with, are authorized, sponsored or approved by Sream and/or RooR Int'l when, in fact, it is not.

79.    The Defendants' unauthorized use in commerce of the RooR Marks as alleged herein constitutes use of a false designation of origin and misleading description and representation of fact in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

80.    XPRESS TOBACCO OUTLET's conduct as alleged herein is willful and is intended to, and is likely to, cause confusion, mistake, or deception as to the affiliation, connection, or association of XPRESS TOBACCO OUTLET, with the Plaintiffs or the RooR Marks.

81.    PATEL actively, knowingly, and intentionally adopted and used the Infringing Marks with the intent to trade on the goodwill of the RooR Marks, cause confusion and deception in the marketplace, and divert potential sales of authentic ROOR water pipes to the Defendants.

82.    PATEL's acts were a moving, active, and conscious force behind XPRESS TOBACCO OUTLET's infringement of the RooR Marks.

83.    PATEL personally engaged in tortious conduct within the state of Indiana.

84.    The Defendants' conduct as alleged herein is causing immediate and irreparable harm and injury to the Plaintiffs, and to the goodwill and reputation of the RooR Marks, and will continue to both damage the Plaintiffs and confuse the public unless enjoined by this Court. The Plaintiffs have no adequate remedy at law.

85.    By reason of the foregoing, the Plaintiffs are entitled to, among other relief, injunctive relief, an award of statutory damages, and costs of the action under Sections 34 and 35

of the Lanham Act, 15 U.S.C. §§ 1116, 1117, together with prejudgment and post-judgment interest.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs, Sream, Inc., a California Corporation, and RooR International BV, a Foreign Corporation, respectfully request the following relief against the Defendants as follows:

1.    With regard to Plaintiffs' claim for trademark infringement:

    a.    statutory damages under 15 U.S.C. § 1117(c) in the amount of $15,000.00;

    b.    Costs of suit;

    c.    Joint and several liability for PATEL, and other officers, and directors, for the knowing participation in the counterfeiting activities of XPRESS TOBACCO OUTLET;

2.    With regard to Plaintiffs' claim for false designation and unfair competition:

    a.    statutory damages under 15 U.S.C. § 1117(c) in the amount of $15,000.00;

    b.    Costs of suit;

    c.    Joint and several liability for PATEL, and other officers, and directors, for the knowing participation in the counterfeiting activities of XPRESS TOBACCO OUTLET;

3.    Preliminarily and permanently enjoining XPRESS TOBACCO OUTLET and its agents, employees, officers, directors, owners, representatives, successor companies, related companies, and all persons acting in concert or participation with it from:

    a.    The import, export, making, manufacture, reproduction, assembly, use, acquisition, purchase, offer, sale, transfer, brokerage, consignment,

distribution, storage, shipment licensing, development, display, delivery, marketing, advertising or promotion of the counterfeit RooR product identified in the Complaint and any other unauthorized RooR product, counterfeit, copy or colorful imitation thereof;

4. Pursuant to 15 U.S.C. § 1116(a), directing XPRESS TOBACCO OUTLET to file with the Court and serve on the Plaintiffs within thirty (30) days after issuance of an injunction, a report in writing and under oath setting forth in detail the manner and form in which XPRESS TOBACCO OUTLET has complied with the injunction;

5. For an order form the Court requiring that XPRESS TOBACCO OUTLET provide complete accountings and for equitable relief, including that XPRESS TOBACCO OUTLET disgorge and return or pay their ill-gotten gains obtained from the illegal transactions entered into and/or pay restitution, including the amount of monies that should have been paid if XPRESS TOBACCO OUTLET had complied with their legal obligations, or as equity requires;

6. For an order from the Court that an asset freeze or constructive trust be imposed on all monies and profits in XPRESS TOBACCO OUTLET's possession, which rightfully belong to the Plaintiffs;

7. Pursuant to 15 U.S.C. § 1118 requiring that XPRESS TOBACCO OUTLET and all others acting under XPRESS TOBACCO OUTLET's authority, at its cost, be required to deliver up to Sream for destruction all products, accessories, labels, signs, prints, packages, wrappers, receptacles, advertisements, and other material in their possession, custody or control bearing any of the RooR Marks;

8.    For treble damages suffered by the Plaintiffs as a result of the willful and intentional infringements engaged in by XPRESS TOBACCO OUTLET, under 15 U.S.C. § 1117(b);

9.    For all costs of suit;

10.    For such other and further relief as the Court may deem just and equitable.

Date: December 16, 2018                    Respectfully Submitted

                                           /s/ *Jonathan G. Chance* _____
                                           Jonathan G. Chance, Esq. (22169-07)
                                           jc@jc-law.com
                                           JC Law Office
                                           123 N.W. 4th Street, Suite 10
                                           Evansville, IN 47708
                                           Tel. 812-301-1282
                                           Fax 812-301-1314
                                           www.jc-law.com
                                           *Attorneys for the Plaintiffs*



## UNITED STATES PATENT AND TRADEMARK OFFICE

UNDER SECRETARY OF COMMERCE FOR INTELLECTUAL PROPERTY AND
DIRECTOR OF THE UNITED STATES PATENT AND TRADEMARK OFFICE

JANUARY 29, 2018

PTAS

COLLARD & ROE, P.C.
1077 NORTHERN BLVD.
ROSLYN, NY 11576

# 900435103

UNITED STATES PATENT AND TRADEMARK OFFICE
NOTICE OF RECORDATION OF ASSIGNMENT DOCUMENT

THE ENCLOSED DOCUMENT HAS BEEN RECORDED BY THE ASSIGNMENT RECORDATION BRANCH
OF THE U.S. PATENT AND TRADEMARK OFFICE. A COMPLETE COPY IS AVAILABLE AT THE
ASSIGNMENT SEARCH ROOM ON THE REEL AND FRAME NUMBER REFERENCED BELOW.

PLEASE REVIEW ALL INFORMATION CONTAINED ON THIS NOTICE. THE INFORMATION
CONTAINED ON THIS RECORDATION NOTICE REFLECTS THE DATA PRESENT IN THE PATENT
AND TRADEMARK ASSIGNMENT SYSTEM. IF YOU SHOULD FIND ANY ERRORS OR HAVE
QUESTIONS CONCERNING THIS NOTICE, YOU MAY CONTACT THE ASSIGNMENT RECORDATION
BRANCH AT 571-272-3350. PLEASE SEND REQUEST FOR CORRECTION TO: U.S. PATENT
AND TRADEMARK OFFICE, MAIL STOP: ASSIGNMENT RECORDATION BRANCH, P.O. BOX
1450, ALEXANDRIA, VA 22313.

RECORDATION DATE: 01/10/2018        REEL/FRAME: 6247/0253
                                   NUMBER OF PAGES: 5

BRIEF: ASSIGNS THE ENTIRE INTEREST

DOCKET NUMBER:    030089

ASSIGNOR:
  BIRZLE, MARTIN                   DOC DATE: 01/08/2018
                                   CITIZENSHIP: GERMANY
                                   ENTITY: INDIVIDUAL

ASSIGNEE:
  ROOR INTERNATIONAL BV            CITIZENSHIP: NETHERLANDS
                                   ENTITY: BESLOTEN VENNOOTSCHAP (B.V.)
  SINT NICOLAASSTRAAT 19
  1012 NJ AMSTERDAM, NETHERLANDS

SERIAL NUMBER: 75241572            FILING DATE: 02/13/1997
REGISTRATION NUMBER: 2235638       REGISTRATION DATE: 03/30/1999
MARK: ROOR
DRAWING TYPE: AN ILLUSTRATION DRAWING WITH WORD(S) /LETTER(S)/ NUMBER(S) IN
             STYLIZED FORM

SERIAL NUMBER: 75514874            FILING DATE: 07/07/1998
REGISTRATION NUMBER: 2307176       REGISTRATION DATE: 01/11/2000
MARK: ROOR
DRAWING TYPE: AN ILLUSTRATION DRAWING WITH WORD(S) /LETTER(S)/ NUMBER(S) IN
             STYLIZED FORM

Exhibit A

6247/0253 PAGE 2

SERIAL NUMBER: 77653139                    FILING DATE: 01/21/2009
REGISTRATION NUMBER: 3675839               REGISTRATION DATE: 09/01/2009
MARK: ROOR
DRAWING TYPE: AN ILLUSTRATION DRAWING WITH WORD(S) /LETTER(S)/ NUMBER(S) IN
             STYLIZED FORM


ASSIGNMENT RECORDATION BRANCH
PUBLIC RECORDS DIVISION



**United States Patent and Trademark Office**

Home | Site Index | Search | FAQ | Glossary | Guides | Contacts | eBusiness | eBiz alerts | News | Help

# Trademarks > Trademark Electronic Search System (TESS)

*TESS was last updated on Mon Apr 9 03:31:02 EDT 2018*

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP |

Logout　Please logout when you are done to release system resources allocated for you.

# Record 1 out of 1

| TSDR | ASSIGN Status | TTAB Status |

*( Use the "Back" button of the Internet Browser to return to TESS)*



| | |
|---|---|
| **Word Mark** | ROOR |
| **Goods and Services** | IC 034. US 002 008 009 017. G & S: SMOKER'S ARTICLES, NAMELY, GLASS PIPES, BONGS, WATER PIPES, WATER PIPES OF GLASS. FIRST USE: 19961010. FIRST USE IN COMMERCE: 19961010 |
| **Mark Drawing Code** | (5) WORDS, LETTERS, AND/OR NUMBERS IN STYLIZED FORM |
| **Trademark Search Facility Classification Code** | LETS-2 ROOR Two letters or combinations of multiples of two letters SHAPES-OVALS Oval figures or designs including incomplete ovals and one or more ovals |
| **Serial Number** | 77653139 |
| **Filing Date** | January 21, 2009 |
| **Current Basis** | 1A |
| **Original Filing Basis** | 1A;44E |
| **Published for Opposition** | June 16, 2009 |
| **Registration Number** | 3675839 |
| **Registration Date** | September 1, 2009 |
| **Owner** | (REGISTRANT) BIRZLE, MARTIN INDIVIDUAL FED REP GERMANY AM ROSENGARTEN 3 FRANKENTHAL FED REP GERMANY 67227 |
| | (LAST LISTED OWNER) ROOR INTERNATIONAL BV BESLOTEN VENNOOTSCHAP (B.V.) NETHERLANDS SINT NICOLAASSTRAAT 19 1012 NJ AMSTERDAM NETHERLANDS |
| **Assignment Recorded** | ASSIGNMENT RECORDED |
| **Attorney of Record** | STEWART J BELLUS |
| **Prior Registrations** | 2235638;2307176 |
| **Description of** | Color is not claimed as a feature of the mark. The mark consists of the term "ROOR" in stylized font with the |

Exhibit B

| | |
|---|---|
| **Mark** | last "R" facing backwards. |
| **Type of Mark** | TRADEMARK |
| **Register** | PRINCIPAL |
| **Affidavit Text** | SECT 15. SECT 8 (6-YR). |
| **Live/Dead Indicator** | LIVE |

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | TOP | HELP |

| .HOME | SITE INDEX | SEARCH | eBUSINESS | HELP | PRIVACY POLICY



**United States Patent and Trademark Office**

Home | Site Index | Search | FAQ | Glossary | Guides | Contacts | eBusiness | eBiz alerts | News | Help

## Trademarks > Trademark Electronic Search System (TESS)

*TESS was last updated on Mon Apr 9 03:31:02 EDT 2018*

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP |

Logout   Please logout when you are done to release system resources allocated for you.

# Record 1 out of 1

| TSDR | ASSIGN Status | TTAB Status | *( Use the "Back" button of the Internet Browser to return to TESS)*



| | |
|---|---|
| **Word Mark** | ROOR |
| **Goods and Services** | IC 025. US 022 039. G & S: CLOTHING, NAMELY, SHIRTS, PANTS, JACKETS, SWEATERS, SOCKS, HATS, CAPS AND FOOTWEAR |
| | IC 034. US 002 008 009 017. G & S: SMOKER'S ARTICLES, NAMELY, CIGARETTES, CIGARS, TOBACCO POUCHES, HUMIDORS, TOBACCO SPITTOONS, CHEWING TOBACCO, SMOKING TOBACCO AND MATCHES |
| **Mark Drawing Code** | (5) WORDS, LETTERS, AND/OR NUMBERS IN STYLIZED FORM |
| **Serial Number** | 75514874 |
| **Filing Date** | July 7, 1998 |
| **Current Basis** | 44E |
| **Original Filing Basis** | 1B;44D |
| **Published for Opposition** | October 19, 1999 |
| **Registration Number** | 2307176 |
| **Registration Date** | January 11, 2000 |
| **Owner** | (REGISTRANT) BIRZLE, MARTIN INDIVIDUAL FED REP GERMANY Am Rosengarten 3 67227 Frankenthal FED REP GERMANY |
| | (LAST LISTED OWNER) ROOR INTERNATIONAL BV BESLOTEN VENNOOTSCHAP (B.V.) NETHERLANDS SINT NICOLAASSTRAAT 19 1012 NJ AMSTERDAM NETHERLANDS |
| **Assignment Recorded** | ASSIGNMENT RECORDED |
| **Attorney of** | STEWART J BELLUS |

| | |
|---|---|
| **Record** | |
| **Priority Date** | March 20, 1998 |
| **Type of Mark** | TRADEMARK |
| **Register** | PRINCIPAL |
| **Affidavit Text** | SECT 15. SECT 8 (6-YR). SECTION 8(10-YR) 20091106. |
| **Renewal** | 1ST RENEWAL 20091106 |
| **Live/Dead Indicator** | LIVE |

TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | TOP | HELP

| .HOME | SITE INDEX| SEARCH | eBUSINESS | HELP | PRIVACY POLICY

United States Patent and Trademark Office

Home | Site Index | Search | FAQ | Glossary | Guides | Contacts | eBusiness | eBiz alerts | News | Help

# Trademarks > Trademark Electronic Search System (TESS)

*TESS was last updated on Mon Apr 9 03:31:02 EDT 2018*

TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP

Logout   Please logout when you are done to release system resources allocated for you.

# Record 1 out of 1

TSDR | ASSIGN Status | TTAB Status   *( Use the "Back" button of the Internet Browser to return to TESS)*



| | |
|---|---|
| **Word Mark** | ROOR |
| **Goods and Services** | IC 021. US 002 013 023 029 030 033 040 050. G & S: glass bowls; glass boxes; [ lamp glass brushes; busts, figurines, figurines, sculptures, statuettes and statues made of crystal, china, earthenware, glass, porcelain and terra cotta; ] glass casters; [ glass fabrics for industrial use; glass fibers for reinforcing plastics and non-textile purposes; enameled, ground plate, opal, opaline, polished plate, pressed, smoothed plate, speckled, spun, stained, stamped, and unwrought glass; ] glass beverageware and bowls; [ containers for household use, namely, glass bulbs; glass etched by acid; plate glass for cars; glass for signal lights and headlights on vehicles; unfinished glass for vehicle windows; glass mosaics not for buildings; ] glass rods, stoppers, [ threads for non-textile purposes and yarns; ] glass tubes not for scientific purposes [ ; glass wool not for insulation; jars for jams and jellies made of earthenware, glass and porcelain; glass knobs; glass mugs and pans; ornaments made of china, crystal, glass, porcelain and terra cotta, not for Christmas trees; stained glass decorations and figurines ] |
| **Mark Drawing Code** | (5) WORDS, LETTERS, AND/OR NUMBERS IN STYLIZED FORM |
| **Serial Number** | 75241572 |
| **Filing Date** | February 13, 1997 |
| **Current Basis** | 44E |
| **Original Filing Basis** | 1B;44E |
| **Published for Opposition** | January 5, 1999 |
| **Registration Number** | 2235638 |
| **Registration Date** | March 30, 1999 |
| **Owner** | (REGISTRANT) BIRZLE, MARTIN INDIVIDUAL FED REP GERMANY Am Rosengarten 3 67227 Frankenthal FED REP GERMANY |

(LAST LISTED OWNER) ROOR INTERNATIONAL BV BESLOTEN VENNOOTSCHAP (B.V.) NETHERLANDS SINT NICOLAASSTRAAT 19 1012 NJ AMSTERDAM NETHERLANDS

| | |
|---|---|
| **Assignment Recorded** | ASSIGNMENT RECORDED |
| **Attorney of Record** | STEWART J. BELLUS |
| **Type of Mark** | TRADEMARK |
| **Register** | PRINCIPAL |
| **Affidavit Text** | SECT 15. SECT 8 (6-YR). SECTION 8(10-YR) 20090317. |
| **Renewal** | 1ST RENEWAL 20090317 |
| **Live/Dead Indicator** | LIVE |

TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | TOP | HELP

|.HOME | SITE INDEX| SEARCH | eBUSINESS | HELP | PRIVACY POLICY

EXECUTION VERSION

## TRADEMARK LICENSE AGREEMENT

THIS TRADEMARK LICENSE AGREEMENT (this "*Agreement*") by and between Martin Birzle, an individual ("*Licensor*"), and Sream, Inc., a California corporation ("*Licensee*"), is made and entered into this __01__ day of __August__, 2013 (the "*Effective Date*").

## BACKGROUND

A.    Licensor is the owner of certain registered and unregistered trademarks, names, designs and logos, along with associated trademark applications and registrations filed with the U.S. Patent and Trademark Office, and incorporated herein by reference (collectively, the "*Mark*," which Mark is identified and/or referenced at **Schedule A** attached hereto).

B.    Licensee manufactures and sells certain products identified on **Schedule B** attached hereto (each a "*Product*" and collectively, the "*Products*").

C.    Licensee desires to use the Mark in conjunction with the sale of the Products in the United States of America (the "*Territory*") and Licensor desires to grant a license to use the Mark to Licensee on the terms and conditions set forth below.

D.    In March 2010, Licensor previously granted to Licensee's president, Jay Faraj, exclusive license rights to the Mark (the "Faraj Agreement"). By and through this Agreement, Licensor seeks to replace Mr. Faraj as the exclusive license with Licensee (an incorporated entity under the management of Mr. Faraj, namely Sream, Inc.), and Mr. Faraj seeks to assign all rights to the Faraj Agreement to Licensee concurrent with the execution of this Agreement.

## AGREEMENT

NOW, THEREFORE, in consideration of the foregoing and of the mutual promises hereinafter set forth, the parties agree as follows:

1.    **License**.

1.1    <u>Grant and Acceptance of License</u>. Subject to the provisions of <u>Section 1.2</u>, Licensor grants to Licensee, subject to the terms and conditions of this Agreement, an exclusive, nontransferable, terminable, royalty-bearing license to use the Mark in conjunction with the manufacturing and sale by Licensee of the Products hereunder.

1.2    <u>Scope of License</u>.

(a)    This Agreement confers an exclusive license to Licensee to manufacture and sell Products bearing the Mark to any third party in the Territory, solely during the Initial Term (as defined in <u>Section 9.1</u> below) of this Agreement (hereinafter, "*Authorized Distribution*"). Notwithstanding anything to the contrary in this Agreement, Licensor reserves the right, at all times during the Term (as defined in <u>Section 9.1</u> below), to manufacture,

91004-2112/LEGAL20889116.8

Exhibit C

distribute, and sell the Products or other products labeled with the Mark that are in nature similar to, and/or competitive with, the Products, outside the Territory. After the expiration of the Initial Term and at all times during the Renewal Term (as defined in Section 9.1 below), Licensee shall only have the right to manufacture and sell the Products to Licensor or any of his designee(s) for further distribution and sale to third parties anywhere in the world, including, without limitation, the Territory. All sales of Products by Licensee to Licensor or any of his designees during the Renewal Term shall be subject to such terms and conditions (including pricing), as shall be negotiated in good faith by the parties before the end of the Initial Term. Once determined by the parties, **Schedule D** to this Agreement shall be amended to include all of the terms and conditions applicable to such Renewal Term sales.

(b)     Licensee shall use the Mark solely in the Territory. Any unauthorized sales of Products by Licensee outside of the Territory to any third party shall be grounds for immediate termination by Licensor, at Licensor's option, and shall obligate Licensee to the payment of damages in an amount equal to $5,500 per unauthorized sale transaction in addition to whatever other liabilities may be incurred by Licensee as a result of such unauthorized sales. Licensee hereby agrees and acknowledges that Licensor would be unduly prejudiced and that the measure of actual damages suffered by Licensor would be difficult to ascertain, in the event that Licensee sold Products outside the Territory. Therefore, Licensee agrees that the liquidated damages provision set forth herein is reasonable under the circumstances to protect Licensor's interests and that such damages shall be in addition to, and not in lieu of, any other remedies available to Licensor under this Agreement.

2.    **Ownership of Mark**.

2.1    Ownership. Licensee acknowledges the ownership of the Mark, including all goodwill associated therewith, in Licensor. Licensee agrees that he will do nothing inconsistent with such ownership and that all use of the Mark by Licensee shall inure to the benefit of and be on behalf of Licensor. Licensee agrees that nothing in this Agreement shall give Licensee any right, title or interest in the Mark other than the right to use the same in accordance with this Agreement, and Licensee agrees that he will not attack or otherwise challenge Licensor's rights in the Mark, the title of Licensor to the Mark, or the validity of the license to use the same hereunder.

2.2    Use of Mark. Licensee shall use the Mark in the form and manner and with appropriate designations as set forth on **Schedule B**, in accordance with Licensor's Brand Image Policy (the **"Brand Image Policy"**), which is attached hereto as **Schedule C**, or as prescribed from time to time by Licensor.

2.3    Non-Circumvention of Licensor's Mark. Licensee further agrees not to use, seek to register, in any jurisdiction, any trademark, service mark, or domain name resembling or confusingly similar (as determined by Licensor in his sole discretion) to the Mark, or that dilutes the Mark or any of Licensor's other marks. If any application for registration is, or has been filed in any country by Licensee that relates to any mark or domain name that, in the sole opinion of Licensor, is confusingly similar, deceptive or misleading with respect to the Mark or any of Licensor's other marks, or that dilutes the Mark or any of Licensor's other marks, Licensee shall immediately cease use and, at Licensor's discretion, immediately abandon any



such application or registration, or assign it to Licensor.  Licensee will not alter, remove, deface or obscure any notice of trademark or other proprietary right on any Product bearing the Mark and will not add to any Product any other trademark or notice of any other proprietary right, except that, subject to strict compliance with the provisions of this Agreement, including, without limitation, <u>Section 3</u> below, Licensee may create, develop, patent and, provided that Licensee has obtained the written consent of Licensor (which consent may be withheld at Licensor's sole discretion) at least sixty (60) days prior thereto, incorporate new technologies into the Products, for which new technologies Licensee patent at any time during and after the expiration of the Term In the event of any infringement, misappropriation or violation relating to the activities of Licensee or any of his employees, agents, representatives, or sales representatives, Licensee will, at his own cost, take all steps reasonably necessary to terminate any such infringement, misappropriation or violation.

2.4    <u>Licensee's Right to Enforce the Mark in the United States.</u>  Throughout the term of this Agreement, including all renewals, Licensor grants Licensee all rights to sue to obtain injunctive relief for past and future infringement of the Mark, to recover damages that Licensor has or may have in profits and damages for past and future infringement of the Mark, including but not limited to the right to compromise, sue for and collect said profits and damages.  The parties intend for the rights afforded under this paragraph to be tantamount to an assignment of said right without actually being an assignment.  In other words, Licensor grants enforcement rights that amount to those of an assignee as contemplated by *Ventures, LLC v. Pittsburg Wholesale Grocers, Inc.*, 2013 WL 1007666 N.D.Cal.,2013; *Spin Master, Ltd. v. Zobmondo Entertainment, LLC* 2011 WL 3714772 C.D.Cal.,2011; and *Waits v. Frito–Lay, Inc.*, 978 F.2d 1093, 1108–09 (9th Cir.1992)).

Licensee further has the right to enter agreement with legal counsel for the enforcement of said rights, including by way of contingency arrangements, and Licensor acknowledges that said counsel shall be entitled to a lien on all recoveries of third party infringement of the Mark. ~~Licensor~~ *Licensee* will, at his own cost: (a) provide such assistance related to such proceeding as Licensor may reasonably request; and (b) assist Licensor in enforcing any settlement or order made in connection with such proceeding.  In other words, Licensor agrees to reasonably cooperate with any enforcement of the Mark in the United States, including without limitation, to produce documents related to the ownership and/or use of the Mark, and to comply with deposition notices and/or subpoenas.

2.5    <u>Notice to Licensor of all Anticipated or Pending Lawsuits Related to Licensor's Intellectual Property.</u>  Licensee will contemporaneously notify Licensor of any infringement, misappropriation or violation of any trademark or other proprietary right of Licensor that comes to Licensee's attention and/or of any litigation that Licensee has commenced to enforce the Mark.

3.    **<u>Quality Standards</u>**.

3.1    <u>Standards of Use</u>.  Licensee shall use the Mark and manufacture Products in accordance with Licensor's standards set forth in the Brand Image Policy attached hereto as **Schedule C** and incorporated herein by this reference.  Licensor reserves the right to change or modify any of the terms and conditions contained in the Brand Image Policy at any time in his



sole and absolute discretion. Any changes or modifications will be effective upon thirty (30) days' written notice to Licensee. Licensee's continued use under the Brand Image Policy following notice of revisions will constitute Licensee's acceptance of such changes or modifications. The foregoing notwithstanding, Licensee shall have the right to contest the application of any such changes or modifications in the Brand Image Policy in the event such changes or modifications impose an unreasonable burden on Licensee in the performance of his obligations hereunder. In such case, Licensee shall notify Licensor in writing within thirty (30) days of receipt of the proposed changes or modifications by Licensor, of Licensee's reasons for asserting that Licensor's changes or modifications are commercially unreasonable and the parties shall then negotiate in good faith mutually acceptable revised terms for the Brand Image Policy. Licensee agrees not to use any other trademarks, service marks, designs, logos, slogans or color schemas in combination with any of the Mark without the prior written approval of Licensor or as otherwise outlined herein. Licensee agrees that he will not sell any Products bearing the Mark unless such Products strictly adhere to the Brand Image Policy. Licensee agrees that the use of the Mark by Licensee shall remain at all times under the exclusive control of Licensor. As an integral part of this quality control, Licensee agrees that the Products bearing the Mark shall be of the highest quality available and shall, at a minimum, be in compliance with all applicable products liability laws and regulations of the Territory. Licensor agrees to provide ongoing consultation and assistance to Licensee to address any quality issues.

3.2    Inspection Rights. Licensee acknowledges that Licensor has the right to inspect the quality and nature of the Products bearing the Mark, and to approve or reject those Products. Licensor shall have the sole discretion to determine whether Licensee is in compliance with Licensor's quality control standards. Licensee agrees to collect, maintain and furnish to the Licensor, at Licensor's request, representative samples of Products and any marketing materials bearing the Mark to assure conformance with all quality standards. Licensor or any designee that has been previously identified in writing by Licensor and disclosed to Licensee as an authorized designee ("*Authorized Designee*"), shall have the right during regular business hours to inspect Licensee's premises, inventories, manufacturing facilities and accounting books and records at any time, in order to determine whether Licensee is adhering to the requirements of this Agreement relating to the use of the Mark. Licensee shall permit Licensor or any Authorized Designees to access his premises, facilities and/or books and records during regular business hours. If Licensor determines that Licensee is not in compliance with the standards set forth in this Section 3 and the Brand Image Policy, Licensee shall immediately cure the non-compliance or discontinue such non-conforming use, at Licensor's sole discretion.

3.3    Records. Licensee shall maintain separate corporate, financial and accounting books and records for the Products bearing the Mark at all times during the Term. Licensee agrees to maintain correct and complete financial books and accounts for his business, which shall be prepared in accordance with United States Generally Accepted Accounting Principles ("*GAAP*") and shall correctly reflect all of the transactions, items of income and expense and all assets and liabilities of Licensee's business as it relates to the Products. Licensor or any certified public accountant designated by Licensor shall be permitted to conduct an audit of the business of Licensee, during regular business hours and upon 48-hour written notice to Licensee, to ensure compliance with this Agreement and to assess Licensee's financial position at any time during the Term.



3.4    <u>Manufacturing Facilities</u>.    Licensee agrees that he shall be the sole manufacturer of the Products bearing the Mark to be sold by Licensee hereunder, except that Licensee may use subcontractors from time to time, provided that a complete list of such subcontractors is provided to Licensor in writing within ten (10) days of the beginning of any such subcontracting relationships.    Notwithstanding anything to the contrary elsewhere in this Agreement, Licensee shall remain at all times fully responsible for the quality of the Products to be sold hereunder and Licensor shall, under no circumstances whatsoever, have any obligations, duties, or liabilities with respect to any such subcontractors.

3.5    <u>Products</u>.    The rights granted under this Agreement to Licensee shall apply solely to the Products set forth on **Schedule B**.  **Schedule B** may be amended from time to time by the parties in writing to reference all approved designs and concepts which the parties have agreed to commercialize as part of the Products, in accordance with the provisions of <u>Section 3.6</u>.

3.6    <u>Brand Development</u>.    Licensee shall be permitted to incorporate his own creative designs and concepts into the Products, in accordance with the Brand Image Policy, so as to develop the goodwill of the Mark as a new and distinctive brand (the **"Brand"**), provided that all such new designs and concepts shall receive Licensor's approval, which approval may be withheld in Licensor's sole discretion, prior to being eligible for bearing the Mark and for Authorized Distribution.    Licensor shall be solely responsible, directly or through agents that Licensor may hire from time to time for such purposes, for the promotion and marketing of the Brand in the Territory, in Licensor's sole discretion, except that Licensee shall be responsible for the cost of such promotional and marketing efforts during the Initial Term.    The parties agree that the budget for promotion and marketing during the Initial Term of this Agreement shall be equal to a maximum of 2.5% of Gross Sales (as defined in <u>Section 5.1</u> below) for all Products calculated on a quarterly basis.  Licensor or his designees shall provide all marketing, advertising or promotional materials incorporating the Mark to Licensee.    Any marketing, advertising or promotional materials incorporating the Mark that is not directly provided by Licensor to Licensee (the **"New Material"**) must be provided to Licensor or his designees for review and written approval before the dissemination or use of any such New Material by Licensee, which approval will be granted at Licensor's sole and absolute discretion.    Licensor agrees to provide ongoing consultation and guidance to Licensee regarding all aspects of Licensee's performance of this Agreement during the Term.    To further enhance the distinctiveness and protect the goodwill of the Brand, Licensee agrees that, during the Term, he will not manufacture or offer for sale any other brand or line of products that substantially imitate, copy, or are confusingly similar to the design and styling of the Brand or of any other existing brand, mark or line of products of Licensor.

3.7    <u>Third Party Consents</u>.    To the extent that Licensee sells, references or identifies any products and/or services, or utilizes any trademark, service mark, trade name, trade dress, logo, logo type, tagline, icon or any other intellectual property (registered or unregistered) with respect to any products and/or services (the **"Content"**) of any third party not a signatory hereto (each, a **"Third Party"**), Licensee hereby represents and warrants that: (i) his use of the Third Party Content does not and will not violate, misappropriate or infringe any copyright, patent, trademark, service mark, trade secret or any other personal, privacy or moral right or any other intellectual property or proprietary right arising under the laws of any jurisdiction of any



person or entity (a "***Third Party Right***"); (ii) Licensee has obtained any and all necessary consents for the use of the Third Party Content; and (iii) Licensee will not place Third Party Content within close proximity to Licensor Content, or otherwise directly or indirectly imply or use Content to imply Licensor's sponsorship, affiliation or endorsement of Third Party Content.

4.    **Disclaimer of Warranty; Waiver**. Licensor delivers and licenses the Mark, "AS IS, "WHERE IS" AND "WITH ALL FAULTS." Licensor makes no representation or warranty as to the condition, availability, strength, character, nature, capability, performance, suitability, "pedigree," source or other characteristic of any such item. LICENSEE WAIVES AND RELEASES ALL RIGHTS AND REMEDIES OF LICENSEE AGAINST LICENSOR, INCLUDING, WITHOUT LIMITATION, ANY CLAIM FOR ANY DIRECT, INDIRECT, INCIDENTAL, SPECIAL, PUNITIVE, ECONOMIC OR CONSEQUENTIAL DAMAGES, COVER OR LOSS OF PROFIT, REVENUE OR USE.

5.    **Royalties**. During the Initial Term, in exchange for the license rights granted hereunder, Licensee shall make the following royalty payments to Licensor:

5.1    <u>Sales by Licensee</u>. With respect to sales of Products (except for Collaborations and Customs Products, as such are identified on **Schedule B** attached hereto, the "***Collaborations/Customs Products***") by Licensee, Licensee shall pay to Licensor an amount equal to 12.5% of Gross Sales (as defined below) per calendar month. With respect to sales of Collaborations/Customs Products, the royalty payments shall be determined by the parties on a case-by-case basis.

For purposes of this <u>Section 5.1</u>, "Gross Sales" shall mean (i) the total wholesale invoice value of all Products' sales to retailers before deductions for operating expenses, cost of goods sold, taxes, interest, customer discounts, returns or allowances, *minus* (ii) the aggregate cost of shipping, freight and insurance charges for all Products sold, per calendar month.

5.2    <u>Sales by Distributors</u>. Licensee may enter into agreements with resellers or distributors for the resale or distribution of the Products. For any such approved resellers or distributors, the royalty payments set forth in <u>Section 5.1</u> shall also apply.

All payments under this <u>Section 5</u> shall be made in accordance with the terms set forth in <u>Section 7</u> hereof.

6.    **Decals Sales**.

6.1    <u>Sole Provider</u>. The parties agree that Licensor shall be the sole provider of all decals bearing the Mark to be affixed to the Products (the "***Decals***").

6.2    <u>Order Procedure</u>. All orders for Decals by Licensee shall be subject to acceptance in writing by Licensor. Licensor reserves the right to cancel any orders placed by Licensee, or to refuse or delay shipment thereof, if, and for so long as, Licensee is and remains in breach of this Agreement, without liability of any kind to Licensee or to any other person.

6.3    <u>Payments</u>. During the Term, Licensor shall inform Licensee as to the current prices for the Decals. Licensee shall pay Licensor for the Decals as set forth in <u>Section 7</u>.



6.4    <u>Shipping</u>.    All Decals will be shipped by Licensor DAP Licensee's designated point of delivery.  The foregoing notwithstanding, the prices for the Decals invoiced to Licensee by Licensor will include all shipping costs and insurance charges incurred by Licensor in providing the Decals to Licensee's designated point of delivery.

6.5    <u>Title and Risk of Loss</u>.    Title and all risk of loss of or damage to Decals will pass to Licensee upon delivery to Licensee's designated point of delivery.

6.6    <u>Taxes</u>.    Licensor's prices do not include any national, state or local sales, use, value added or other taxes, customs duties, or similar tariffs and fees which may be required to be paid or collected upon the delivery of Decals or otherwise.  Should any tax or levy be made, Licensee agrees to pay such tax or levy and indemnify Licensor for any claim for such tax or levy demanded.  Licensee will pay any withholding taxes required by applicable law.  If applicable, Licensee will supply Licensor with evidence of such payment of withholding tax, in a form acceptable to Licensor to meet the requirements for claiming foreign tax credits on Licensor's income tax return.

7.    **General Payments Terms**.    All royalties' payments due under <u>Section 5</u> shall be made on a monthly basis, on or before the fifteenth (15th) day of the month immediately following the month in which the applicable Products are sold.  All Decals sales payments due under <u>Section 6</u> shall be made within thirty (30) days of receipt of the Decals by Licensee.  All payments under <u>Section 5</u> and <u>Section 6</u> shall be made by wire transfer of immediately available funds to a bank account of Licensor provided to Licensee in writing.  Interest shall accrue on any delinquent payments owed by Licensee at the rate of eight percent (8%) per annum.  Failure to pay any amounts due Licensor for more than ten (10) days after the due date pursuant to the provisions hereof shall be grounds for immediate termination of this Agreement at the sole discretion of Licensor pursuant to <u>Section 9</u>.

8.    **Confidentiality**.

8.1    <u>Obligations</u>.    Licensee recognizes that he has had, or will have, access to, and knowledge of, matters concerning the business of Licensor, including, without limitation, business, financial situation, products, customers, trade secrets, know-how, formulas, compositions of matter, inventions, techniques, processes, programs, diagrams, schematics, sales and marketing plans, all of which being of a confidential and proprietary nature ("***Confidential Information***").  Licensee covenants that he will (i) use such Confidential Information only in connection with fulfilling his obligations under this Agreement, (ii) during the term of this Agreement and for a period of five (5) years thereafter, hold such Confidential Information in strict confidence and exercise due care with respect to his handling and protection of such Confidential Information, consistent with his own policies concerning protection of his own proprietary and/or trade secret information and (iii) disclose, divulge or publish the same only to such of his employees or representatives as are Qualified Personnel (as defined below) and to no other person or entity, whether for his own benefit or for the benefit of any other person or entity.  Licensee further agrees to return all copies of all Confidential Information in his possession, control or custody immediately upon termination or expiration of this Agreement.  As used herein, the term "Qualified Personnel" means such employees and representatives of Licensee who (x) have a need to know or have access the Confidential Information in order for such



employees or representatives to carry out the purposes of this Agreement and (y) have executed nondisclosure agreements binding them not to use or disclose such Confidential Information except as permitted herein.

8.2    <u>Exceptions</u>.  The obligations contained in <u>Section 8.1</u> will not apply to Confidential Information which (i) is or becomes public knowledge without the fault or action of Licensee, (ii) is received by Licensee from a third party source, which source received the information without violation of any confidentiality restriction, (iii) is independently developed by Licensee without violation of any confidentiality restriction, (iv) is or becomes available to Licensee on an unrestricted basis from Licensor, or (v) is deemed responsive to a discovery demand in litigation, or in response to a lawfully issued subpoena, provided that such disclosure is made pursuant to a "confidential" and/or "attorneys eyes only designation" as provided for in the protective order governing said litigation.

9.    <u>**Term and Termination**</u>.

9.1    <u>Term</u>.  This Agreement shall be for a continuous term beginning on the Effective Date and ending on the day preceding the third anniversary of the Effective Date ("***Initial Term***"), and shall automatically renew for another one (1) year at the expiration of the Initial Term (the "***Renewal Term***"), on the same terms and conditions (except for such terms and conditions that are made applicable solely to either the Initial Term or the Renewal Term) as set forth in this Agreement (as modified from time to time by the parties).  The Initial Term, together with the Renewal Term, is collectively referred to in this Agreement as the "<u>Term</u>." Notwithstanding the foregoing, either party may terminate this Agreement prior to the expiration of the Term pursuant to <u>Sections 9.2</u> and <u>9.3</u>, and with the effect set forth in, <u>Section 9.4</u>.

9.2    <u>Termination by Licensor</u>.  Without prejudice to any other rights which Licensor may have, Licensor can at any time terminate this Agreement, effective upon notice to Licensee, upon the occurrence of any of the following: (i) Licensee does any act to bring the Mark into disrepute; (ii) Licensee breaches any provision, representation or covenant of this Agreement; (iii) Licensor reasonably determines that this Agreement violates any applicable laws, rules or regulations and the party/parties cannot come into compliance with the laws; (iv) the Products allegedly violate any Third Party Rights; (v) Licensee's insolvency, which shall be defined as (i) Licensee's failure to pay his debts as they come due or (ii) when the fair market value of Licensee's assets are less than the value of Licensee's accrued liabilities; (vi) Licensee's assignment for the benefit of its creditors or any other unapproved assignment or transfer of Licensee's rights under this Agreement; or (vii) the placement of Licensee's assets in the hands of a trustee or receiver.

9.3    <u>Termination by Licensee</u>.  Licensee may terminate this Agreement effective upon notice to Licensee, upon the occurrence of any of the following: (i) Licensor no longer owns sufficient proprietary rights in the Mark; (ii) Licensor breaches any provisions of this Agreement; or (iii) Licensee reasonably determines that this Agreement violates any applicable laws, rules or regulations and the party/parties cannot come into compliance with the laws.



9.4    <u>Effect of Termination</u>.  Upon termination of this Agreement, Licensee agrees to: (i) immediately discontinue all use of the Mark, and any term confusingly similar to or dilutive of the Mark; (ii) delete the Mark from his business name; (iii) destroy all printed materials, marketing and promotional materials, and advertisements bearing the Mark; and (iv) return all Confidential Information in his possession to Licensor.  The foregoing notwithstanding, Licensee shall be permitted to continue to sell, existing inventories of Products bearing the Mark to a third party (if, and only if, this Agreement is terminated at any time during the Initial Term), for a maximum of sixty (60) days following the termination of this Agreement (the "*Grace Period*").  Licensee hereby agrees and acknowledges that Licensor would be unduly prejudiced and that the measure of actual damages suffered by Licensor would be difficult to ascertain, in the event that Licensee continued to sell Products bearing the Mark to any third party at any time after the expiration of the Grace Period.  Therefore, Licensee agrees that for any sales of Products bearing the Mark to a third party after the expiration of the Grace Period, Licensor shall be entitled to collect liquidated damages in the amount of $1,500 per day after the expiration of the Grace Period, which damages shall be in addition to, and not in lieu of, any other remedies available to Licensor under this Agreement.  Licensee specifically agrees that such liquidated damages are reasonable and fair under the circumstances.  Termination of this Agreement for any reason provided herein shall not relieve either party from his obligation to perform up to the effective date of such termination (including, without limitation, the obligation of Licensee to pay royalties in the event of a termination pursuant to <u>Section 9.3(i)</u>) or to perform such obligations as may survive termination.  The provisions of <u>Sections 2</u>, <u>3</u>, <u>4</u>, <u>8</u>, <u>9.4</u>, <u>10</u>, and <u>12</u> of this Agreement shall survive any expiration or termination of this Agreement for any reason.  Licensor shall not be liable to Licensee in connection with any costs, damages or losses of any kind as a result of the termination of this Agreement for any reason.

10.    <u>**Indemnification**</u>.  Licensee will at all times defend, indemnify and hold harmless Licensor, his affiliates and all officers, shareholders, directors, managers, members, agents, heirs, successors and assigns of each of the foregoing (collectively, the "*Indemnified Parties*") from and against, and pay and reimburse the Indemnified Parties for, any and all liabilities, obligations, losses, damages, costs or expense (including interest, penalties and reasonable attorneys' fees) incurred in connection with any Third Party claims to the extent arising out of, resulting from or relating to:  (i) any claim of violation of a Third Party Right; (ii) any representation, warranty or covenant by Licensee contained herein being untrue in any respect or being breached in any manner; (iii) any alleged negligent, strict liability or intentional act or omission on the part of Licensee, his employees or agents in the performance of his obligations set forth in this Agreement; (iv) an alleged breach of this Agreement;; or (v) Licensee's unauthorized use of the Mark.  In connection with any claim or action described in this <u>Section 10</u>, subject to the provisions of <u>Section 2.3</u>, Licensor will cooperate with Licensee (at Licensee's expense) in connection with the defense and settlement of the claim.  Licensee may not settle the claim without Licensor's prior written consent.  Further, Licensor may participate in the defense and settlement of the claim.

11.    <u>**Sales Outside Territory/Distribution Agreement**</u>.  Licensor agrees during the Term to give Licensee a right of first refusal to manufacture all Products, or any component thereof, to be sold by Licensor outside the Territory.  The parties may, contemporaneously with this Agreement, enter into a manufacturing/distribution agreement with respect to the Products



whereby Licensee shall manufacture Products for resale by Licensor outside the Territory (the "**Distribution Agreement**").

12. <u>**Miscellaneous Provisions.**</u>

12.1 <u>General Covenants.</u> Licensee shall: (i) conduct business in a professional manner that reflects favorably at all times on the Mark and the good name, goodwill and reputation of the Mark and Licensor, (ii) avoid deceptive, misleading, fraudulent or unethical practices that are or might be detrimental to Licensor and the Mark, and (iii) make no false or misleading representations with regard to the Mark or Licensor.

12.2 <u>Costs and Expenses.</u> Except as expressly provided herein or agreed to in writing by the parties, Licensee will pay all costs and expenses incurred in the performance of his obligations under this Agreement.

12.3 <u>Independent Contractors.</u> Neither party will, for any purpose, be deemed to be an agent, partner or franchisee of the other party. The relationship between the parties will only be that of independent contractors. Neither party will have any right or authority to assume or create any obligations or to make any representations or warranties on behalf of any other party, whether express or implied, or to bind the other party in any respect whatsoever.

12.4 <u>Entire Agreement.</u> This Agreement is the entire agreement between the parties and supersedes all prior agreements, negotiations and communications of whatever type, whether written or oral, between the parties hereto with respect to the subject matter of this Agreement.

12.5 <u>Amendment.</u> This Agreement may be amended at any time by mutual agreement of the parties without additional consideration, provided that, before any amendment will become effective, it will be reduced to writing and signed by the parties.

12.6 <u>Arbitration; Applicable Law.</u> In the event of any dispute involving any matter between the parties, whether arising out of this Agreement or otherwise, including any dispute involving the validity of this Agreement, each party shall confer in good-faith by telephone or in person in an effort to resolve the dispute prior to the initiation of the arbitration process described in this section. In the event that the parties are unable to resolve the dispute following such conference (or in the event that either party refuses to confer), the exclusive forum for the resolution of the dispute shall be the Frankfurt am Main Chamber of Commerce and Industry (the "**Frankfurt CCI**"), and the parties shall be bound by the award of a sole arbitrator appointed within ten days of the time of the demand for arbitration. The arbitration shall proceed under the Arbitration Rules of the Frankfurt CCI in effect at the time of the demand for arbitration, and specifically under the Supplementary Rules for Expedited Proceedings of the German Institution of Arbitration e.V. (DIS), without recourse to any court of law except for a request for injunctive relief to enforce a party's right under this Agreement or under the law applicable in the forum in which such injunctive relief is sought (other than injunctive relief to stay the arbitration, which the parties waive the right to seek). The oral hearing shall be held in Frankfurt, Germany, unless the parties agree that either of them may participate by telephone. The substantive law applicable to any claim or counterclaim shall be



the law that would be applied by a court in the Federal Republic of Germany without regard to any conflicts-of-laws rules. The arbitrator shall have the exclusive authority to determine any issue concerning the arbitrability of any dispute, and the parties waive any right they might otherwise have to seek a court ruling on the issue of arbitrability.

12.7   Prevailing Party Attorneys' Fees.   Should any party commence legal action to interpret or enforce the terms of this Agreement, the prevailing party in such action shall be entitled to recover reasonable attorneys' fees and costs.

12.8   Remedies.   Except as otherwise expressly provided in this Agreement, each and all of the rights and remedies provided in this Agreement, and each and all of the remedies allowed at law and in equity, will be cumulative, and the exercise of one right or remedy will not be exclusive of the right to exercise or resort to any and all other rights or remedies provided in this Agreement or at law or in equity.

12.9   Specific Performance.   Licensee acknowledges that any breach of this Agreement may cause irreparable harm, the amount of which may be difficult to ascertain, and therefore agrees that Licensor shall have the right to seek and obtain injunctive relief against Licensee, and specific performance, without the necessity of posting a bond.

12.10   Assignment.   Licensee will not assign or delegate any of its rights, obligations or licenses under this Agreement, and any such assignment or delegation is expressly prohibited and will be void. The foregoing notwithstanding, Licensee may, upon the prior written consent of Licensor, grant sublicenses with respect to the Mark, provided that any such permitted sublicensees shall agree in writing to be bound by the terms of this Agreement as applicable to Licensee. Subject to the prohibition contained in this paragraph, this Agreement will be binding upon and inure to the benefit of the successors and permitted assigns of the parties hereto. Licensor may assign or delegate its rights and obligations under this Agreement without notice to Licensee.

12.11   Severability.   The provisions of this Agreement will be deemed severable and, if any portion will be held invalid, illegal or unenforceable for any reason, the remainder of this Agreement will be effective and binding upon the parties.

12.12   Waiver.   The failure of either party to this Agreement to insist upon strict performance of any covenant or condition hereof, in any one or more instances, will not be construed as a waiver or relinquishment of any such covenant or condition, but the same will be and remain in full force and effect.

12.13   No Third Party Rights.   Licensor does not intend the benefits of this Agreement to inure to any Third Party.

12.14   Construction of Agreement.   It is agreed by the parties that the terms of this Agreement have been fairly bargained for after careful consideration by the parties; therefore, this Agreement shall be enforced, interpreted and construed without regard to its authorship, and no inference shall be drawn by the parties or any Third Party, including any court, by virtue of its authorship.



12.15   <u>Captions</u>.  Any captions or headings of the articles, sections, subsections, paragraphs, or subparagraphs of this Agreement are solely for the convenience of the parties, are not a part of this Agreement and will not be used for the interpretation or determination of validity of this Agreement or any provision hereof.

12.16   <u>Counterparts; Electronic Signature</u>.  This Agreement may be executed in counterparts, each of which will be deemed an original, and all of which together constitute one and the same instrument.  To expedite the process of entering into this Agreement, the parties acknowledge that Transmitted Copies of this Agreement will be equivalent to original documents until such time as original documents are completely executed and delivered.  "***Transmitted Copies***" means copies that are reproduced or transmitted via photocopy, facsimile or other process of complete and accurate reproduction and transmission.

12.17   <u>Notices</u>.  Unless otherwise provided, any notice or other communication required or permitted under this Agreement shall be given in writing and shall be deemed effectively given (a) upon personal delivery to the party to be notified; (b) when received when sent by e-mail or fax by the party to be notified; <u>provided</u>, <u>however</u>, that notices given by e-mail or fax shall not be effective unless either (i) a duplicate copy of such e-mail or fax notice is promptly given by one of the other methods described in this <u>Section 12.17</u> or (ii) the receiving party delivers a written confirmation of receipt for such notice either by e-mail, fax or any other method described in this <u>Section 12.17</u>; (c) one (1) business day after deposit with an express overnight courier for United States deliveries, or two (2) business days after such deposit for deliveries outside of the United States, with proof of delivery from the courier requested; or (d) three (3) business days after deposit in the United States mail by certified mail (return receipt requested) for United States deliveries.  All notices for delivery outside the United States will be sent by facsimile, by e-mail or by express courier.  Notices by facsimile shall be machine verified as received.  All notices not delivered personally, by facsimile or by e-mail will be sent with postage and/or other charges prepaid and all notices shall be properly addressed to the party to be notified at the address, or facsimile number as follows, or at such other address or facsimile number as such other party may designate by one of the indicated means of notice herein to the other parties hereto as follows, or at such other address as such party may designate by 10 days' advance written notice to the other parties given in the foregoing manner:

        To Licensor:

                Martin Birzle
                Am Rosengarten 3
                67227 Frankenthal
                Federal Republic of Germany
                Facsimile: (___) ___-____
                E-Mail: mb@backsite.de



To Licensee:

> Jay Faraj
> Sream, Inc.
> 12825 Temescal Canyon Rd. Ste. B
> Entity City, State, Zip: Corona CA 92883
> USA
> Facsimile:  (___) ___-____
> E-Mail: jfarraj@sbcglobal.net

*[Remainder of page intentionally left blank.]*



IN WITNESS WHEREOF, the parties hereto have executed this Trademark License Agreement as of the day and year first above written.

**Licensor:**

01.08.2013

Martin Birzle

**Licensee:**

Jay Faraj

EXECUTION VERSION

## SCHEDULE A

### MARK

1.      U.S. Trademark Registration Number 3,675,839 for the word mark "ROOR" and its logo in association with goods further identified in the registration in international class 034.

2.      U.S. Trademark Registration Number 2,307, 176 for the word mark "ROOR" and its logo identified below in association with goods further identified in the registration in international classes 025 and 034.

3.      U.S. Trademark Registration Number 2,235,638 for the word mark "ROOR" and its logo identified below in association with goods further identified in the registration in international class 021.

4.      Any and all other registered or unregistered trademark rights in the word mark "ROOR" and in the marks shown below:





91004-2112/LEGAL20889116.8



EXECUTION VERSION

## SCHEDULE B

## PRODUCTS

1. Water pipes, bubblers, and ash catchers, including without limitation, those with the following attributes:
   a. Size:  8" to 24"
   b. Diameter:  26mm to 60mm
   c. Color:  Production and custom colors
   d. Filter type:  straight downstream, 10-arm filter, toque, meniscus
   e. Shape:  straight or beaker
2. Smoking accessories, such as ash trays, down stem bowls
3. Apparel, such as t-shirts, shirts, and hats
4. Glass cleaner
5. Collaborations
6. Customs
7. Any and all other technological progressions and improvements of the foregoing items.
8. Cypress Hill's Phuncky feel Tips by RooR (Third party's intellectual property)

## SCHEDULE C

## BRAND IMAGE POLICY

*Last Update: June 1, 2011*

1. **Introduction.**

This Brand Image Policy (this "***Policy***") is intended for authorized licensees, distributors, sellers, and other third parties who manufacture, distribute or sell products (the "***Products***") that bear the mark ROOR (the "***RooR Brand***") or ROOR (the "***RooR Tech Brand***" and collectively with the RooR Brand, the "***Brands***") and sets forth the rules for the proper usage and protection of the Brands' corresponding trademarks set forth on **Exhibit A** attached hereto (collectively, the "***Trademarks***").

All usage of either Brand and all manufacture, marketing and distribution of any Products are subject to and conditioned upon compliance with this Policy, as well as any and all terms and conditions of applicable trademark license, sales, marketing or distribution agreement, as applicable (collectively, "***Agreements***") between you and Martin Birzle ("***Licensor***"). The terms of any such Agreement shall supersede the policies set forth herein to the extent that such policies are inconsistent with such Agreement.

Licensor reserves the right to change or modify any of the terms and conditions contained in this Policy at any time in his sole and absolute discretion. Any changes or modifications will be effective immediately upon thirty (30) days' written notice to you. Your continued use under the Policy following receipt of the revised Policy will constitute your acceptance of such changes or modifications.

2. **Manufacturing Standards.**

- All glass water pipes Products sold under the RooR Tech Brand (a) shall consist of Schott glass and Lenz laborgasinstrumente ground fittings and joints, (b) shall utilize "in-tube" filtration systems, (c) shall not include carbon adapter, and (d) shall remain overall distinctive with notable styling differences from the RooR Brand.

- All glass Products sold under the RooR Tech Brand shall be of superior craftsmanship quality, using high end raw materials and shall be of quality at least equal to or superior to the RooR Brand's glass products line.

- All apparel Products sold under the RooR Tech Brand must be of quality at least equal to or superior to the RooR Brand's apparel line, including with respect to fiber, fabric and construction techniques.

- Pricing for all Products under the RooR Tech Brand shall reflect the standard of quality set forth herein and be consistent with the RooR Brand to maintain the top shelf image



The appropriate notice for each of the Trademarks as of the latest update of this Policy is set forth in the Trademark chart attached hereto as **Exhibit A**. If marks currently listed in the chart with a ™ become registered, they will be updated with the ® symbol in the next revision of this Policy.

The ® or ™ symbol, as appropriate, should appear in the upper right corner of the mark (in the same location a footnote number would appear). It should be used at a minimum the first time a mark appears in text and in all prominent usages in which the mark is set apart from other text. Every appearance of a logo or logotype or a Trademark used on any Product packaging should always be marked with the appropriate Trademark symbol.

      5.3.    <u>Use of Logos, Logotypes, Brand Icons, Symbols, Illustrations and Product Photographs</u>. All use of any Brand logos, logotypes, brand icons, symbols and illustrations and the use of any photographs of Products must be used under the terms of your Agreement and in strict accordance with the provisions of the Policy. You may not modify, crop, distort, morph or animate any such item in any manner without the express written permission of Licensor in each instance.

      5.4.    <u>Use of Mark within Company Name or Domain Name</u>. Registration and/or use of a business name or assumed business name which is comprised of any Trademark in any way, shape or form is strictly prohibited. Registration and/or use of a domain name wherein the second level is comprised of any Trademark in any way, shape or form is also strictly prohibited, except with the prior written approval of Licensor.

      5.5.    <u>Chart of Current Marks</u>. A chart of current Trademarks (registered and unregistered), and the appropriate symbol and descriptor(s) to be used as of the date of the last update of this Policy, is set forth on **Exhibit A** hereof.

**6.**    **<u>Intellectual Property Protection and Indemnification</u>.**

      6.1.    <u>Protection</u>. You agree to immediately notify Licensor of any infringement, misappropriation or violation of any patent, copyright, trademark, trade secret or other proprietary right of Licensor that comes to your attention. In the event of any such infringement, misappropriation or violation relating to your activities or any activities of your employees, agents, representatives, distributors, dealers, sales representatives or customers, you agree to take all steps reasonably necessary to terminate any such infringement, misappropriation or violation. Licensor will have exclusive control over the prosecution and settlement of any legal proceeding to enforce, to recover damages on account of any infringement, misappropriation or violation of, or to defend any of its proprietary rights. You agree to: (a) provide such assistance related to such proceeding as Licensor may reasonably request; and (b) assist Licensor in enforcing any settlement or order made in connection with such proceeding.

      6.2.    <u>Third Party Consents</u>. To the extent that you sell, reference or identify any products and/or services, or utilize any trademark, service mark, trade name, trade dress, logo, logo type, tagline, icon or any other intellectual property (registered or unregistered) with respect to any products and/or services (the "***Content***") of any third party not a signatory to your Agreement (each, a "***Third Party***"), you hereby represent and warrant that: (i) your use of the



of the RooR Brand line and to establish the RooR Tech Brand as an equally high-quality brand.

**3.    Advertising and Collateral Material.**

All advertising and collateral materials must be produced in strict accordance with this Policy, the specific terms of your specific Agreement, and correct usage and attribution of all Brands. Use of any logos, logotypes, taglines, icons, illustrations or Product photos must be pursuant to your Agreement, and in conformance with this Policy.   All materials must be submitted to Licensor and approved in writing prior to any use or distribution thereof and must comply with the following:

      3.1.    Visual Requirements.

          (a)    In the use of illustrations and photographs, if a particular style is featured, a correct Product name must accompany the illustration or photo.

          (b)    Use of the Brand logo is required in any and all advertisements.

      3.2.    Pricing.  If an advertisement (or collateral materials) contains pricing information, it must be current and accurate.

**4.    Packaging.**

All Products must be sold in packaging approved by Licensor.

**5.    Trademarks.**

      5.1.    Proper Trademark Use.  You must comply with the following usage guidelines whenever using any Trademark:

          (a)    Always use the marks exactly (as set forth in **Exhibit A**) without varying spelling or spacing, abbreviating, adding or deleting hyphens, breaking into two or more words, combining marks, pluralizing, making possessive or otherwise altering the marks in any manner.

          (b)    Keep Trademarks visually distinct from other text, images or materials. Capitalizing, bolding, italicizing and using a logotype are common ways of accomplishing this.

          (c)    Provide a proper Trademark notice as described below.

      5.2.    Proper Notice.  A proper trademark symbol must be used in connection with all Trademarks.  Depending on the mark's status, there are two proper notices for the Trademarks:

          (a)    ® indicates a trademark registered in the United States.

          (b)    ™ indicates a trademark that is not registered, but used as a trademark.



Third Party Content does not and will not violate, misappropriate or infringe any copyright, patent, trademark, service mark, trade secret or any other personal, privacy or moral right or any other intellectual property or proprietary right arising under the laws of any jurisdiction of any person or entity (a *"Third Party Right"*); (ii) you have obtained any and all necessary consents for the use of the Third Party Content; and (iii) you will not place Third Party Content within close proximity to Licensor Content, or otherwise directly or indirectly imply or use Content to imply Licensor's sponsorship, affiliation, or endorsement of Third Party Content.

6.3.    Indemnification.  You agree that you will at all times defend, indemnify and hold harmless Licensor, his affiliates and all officers, shareholders, directors, managers, members, heirs, successors and assigns of each of the foregoing (collectively, the *"Indemnified Parties"*) from and against, and pay and reimburse the Indemnified Parties for, any and all liabilities, obligations, losses, damages, costs or expense (including interest, penalties and reasonable attorneys' fees) incurred in connection with any Third Party claims to the extent arising out of, resulting from or relating to: (i) any claim of violation of a Third Party Right; (ii) any representation, warranty or covenant by you contained herein being untrue in any respect or being breached in any manner; (iii) any alleged negligent, strict liability or intentional act or omission on your part or on the part of your employees or agents in the performance of your obligations set forth in this Policy; or (iv) an alleged breach of any agreement to which the Indemnified Parties and you are parties.  In connection with any claim or action described in this Section 6.3, Licensor will cooperate with you (at your expense) in connection with the defense and settlement of the claim.  You may not settle the claim without Licensor's prior written consent.  Further, Licensor may participate in the defense and settlement of the claim.

7.    **General Rules**.

7.1.    You acknowledge that all rights in and to the Trademarks are the sole and exclusive property of Licensor and that all goodwill generated through your use of any of the Trademarks shall inure solely to the benefit of Licensor.

7.2.    You may not use any logo, logotype, icon, photograph or illustration of Licensor unless specifically authorized in your Agreement.

7.3.    You may not copy or publish the Trademarks, except as expressly authorized by Licensor herein or in your Agreement.  Under no circumstances may you license, sublicense, assign, sell or otherwise transfer any right conferred to you to use the Trademarks, without the prior written consent of Licensor.  You may not alter the Trademarks in any manner, including size, proportions, colors, elements, additions, etc., or animate, morph or otherwise distort or modify its perspective or appearance, without Licensor's prior written consent.

7.4.    All use of the Trademarks and the Brands is subject to review and approval by Licensor, and this Policy is not intended to be a complete statement of Licensor's requirements regarding proper Trademark usage.  Licensor reserves the right to object to and disapprove of any use of its Trademarks that it deems to be undesirable, improper or unlawful, even if such use is not expressly prohibited by this Policy or your Agreement.



7.5.    Your use may not be obscene or pornographic, and may not be disparaging, defamatory or libelous to Licensor or any other person, product or entity.

7.6.    Your use may not infringe any of Licensor's intellectual property or other rights, may not violate any state or federal laws, and must comply with international intellectual property laws.

7.7.    You agree to Licensor's periodic inspection of your use of the Trademarks as necessary to confirm such use conforms to this Policy. Any non-conforming use must immediately be brought into conformance. Alternatively, Licensor may, at its sole and absolute discretion, elect to terminate all rights of use of its Trademarks, as well as your Agreement.

7.8.    Licensor may from time to time update the Trademarks to include other content, including other or new Trademarks, terms, format and design (the *"New Content"*). The same terms set forth herein shall apply to any New Content. You shall use the New Content and discontinue use of any outdated Trademarks.



## EXHIBIT A – TRADEMARK CHART

### *Please note that this chart may not reflect a comprehensive list of all of Licensor's Trademarks.*

5.      U.S. Trademark Registration Number 3,675,839 for the word mark "ROOR" and its logo in association with goods further identified in the registration in international class 034.

6.      U.S. Trademark Registration Number 2,307, 176 for the word mark "ROOR" and its logo identified below in association with goods further identified in the registration in international classes 025 and 034.

7.      U.S. Trademark Registration Number 2,235,638 for the word mark "ROOR" and its logo identified below in association with goods further identified in the registration in international class 021.

8.      Any and all other registered or unregistered trademark rights in the word mark "ROOR" and in the marks shown below:







# SCHEDULE D

## RENEWAL TERM SALES

[TBA]

This FIRST AMENDMENT TO LICENSE AGREEMENT is hereby entered into on this the 27 day of February , 2015, (the "effective date") between Martin Birzle, an individual, ("*Licensor*") and Sream, Inc. a California Corporation ("*Licensee*")

## RECITALS

WHEREAS, Licensor and Licensee have entered into a Licensing Agreement dated as of August 1, 2013, a copy of which is attached hereto as Exhibit A (the "License Agreement"); and

WHEREAS, Licensor and Licensee desire to amend Sections 2.4, and 9 of the License Agreement concerning the rights associated with the Roor trademarks and brand.

NOW, THEREFORE, in consideration of the terms and conditions set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1. Definitions. Each initially capitalized term used herein without definition shall have the meaning ascribed to such term in the License Agreement.

2. Section 2.4 Amendments. It is hereby agreed that Section 2 of the License Agreement shall be amended, effective as of the date hereof, to read in its entirety as follows:

2.4      Licensee's Right to Enforce the Mark in the United States.  Throughout the term of the original agreement and this Amendment, and including all renewals, Licensor appoints the Licensee its legal representative herein, in the entire United States and its territories and possessions  to police and enforce all rights in the marks as set forth on Schedule A hereto; and further grants Licensee all of his unrestricted rights to sue to obtain injunctive relief for past and future infringement of the Mark, to recover damages that Licensor has or may have in profits and damages for past and future infringement of the Mark, including but not limited to the right to compromise, sue for and collect said profits and damages. The parties intend for the rights afforded under this paragraph to be tantamount to an assignment of all of said rights and responsibilities attendant there to. In other words, Licensor grants enforcement rights that amount to those of an assignee as contemplated by Ventures, LLC v. Pittsburg Wholesale Grocers, Inc., 2013 WL 1007666 N.D.Cal.,2013; Spin Master, Ltd v. Zobmondo Entertainment, LLC 2011 WL 3714772 C.D.Cal.,2011; and Waits v. Frito-Lay, Inc., 978 F.2d  1093, 1108-09 (9th Cir.1992)); and

Telebrands Corp v. Del Laboratories, Inc. Coty US and Coty Inc. 719 F. Supp.2d 283( S.D.N.Y. 2010), and Calvin Klein Jeanswear Co. v. Tunnel Trading, 2001 WL 1456577 (S.D.N.Y. 2001).

Licensee further has the right to enter agreement with legal counsel for the enforcement of said rights as licensee deems fit, including by way of contingency arrangements, and Licensor acknowledges that said counsel shall be entitled to a lien on all recoveries of third party infringement of the Mark. Licensee will, at its own cost: (a) provide such assistance related to such proceeding as may reasonably request; and (b) licensor will assist Licensee in enforcing any settlement or order made in connection with such proceeding. In other words, Licensor agrees to reasonably cooperate with any enforcement of the Mark in the United States, including without limitation, to produce documents related to the ownership and/or use of the Mark, and to comply with deposition notices and/or subpoenas.

3. Term of Amendment. This Amendment modifies section 9 of the Original License Agreement as follows:

9.4.    Renewal Term. The original Agreement between the parties is hereby renewed and extended in conformity with paragraph 9.1. The Agreement shall be for a continuous term beginning on the Effective Date of this Amendment and ending on the day preceding the Fifth (5) anniversary of the Effective Date of this amendment *("First Renewal Term"),* and; thereafter the agreement shall automatically renew for one five (5) year term on the same terms and conditions as this Renewal term , (the *"Second Renewal Term* ") except for such terms and conditions that are made applicable solely to either the Initial Term or the First Renewal Term) as set forth in the Original Agreement and Modification Agreement, or as otherwise modified from time to time by the parties. The Initial Term, together with the First Renewal Term, is collectively referred to in this Agreement as the "Term." Notwithstanding the foregoing, either party may terminate this Agreement prior to the expiration of the Term pursuant to Sections 9.2 and 9.3, and with the effect set forth in, Section 9.4.

4. Full Force and Effect. Except as specifically modified or amended by the terms of this Amendment, the License Agreement and all provisions contained therein are, and shall continue, in full force and effect and are hereby ratified and confirmed.

5. Counterparts. This Amendment may be executed in any number of separate counterparts, and/or by facsimile transmission, each of which when executed shall be deemed to be an original and all of which together shall constitute a single instrument binding upon the Parties.

6. Miscellaneous. This Amendment shall be binding upon all the parties to the License Agreement and their respective successors and assigns. This Amendment shall be governed by, and construed and enforced in accordance with, the internal laws in effect in the State of California and New York.

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be duly executed and delivered by their proper and duly authorized officers as of the day and year first above written.

Agreed and Accepted:                    Agreed and Accepted:

MARTIN BIRZLE:                          SREAM INC.

By: _____        _____ President

                                        Title

## RATIFICATION AGREEMENT

This RATIFICATION AGREEMENT (the "Ratification Agreement"), dated as of February ___, 2018 (the "Effective Date") is entered into by RooR International BV, located at Sint Nicolaasstraat 19, 1012 NJ, Amsterdam; and acknowledged by Martin Birzle, an individual citizen of Germany, whose address is Am Rosengarten 3, 67227 Grankenthal, Federal Republic of Germany, and Sream, Inc., a California Corporation, located at 12825 Temescal Canyon Rd Ste B, Corona, CA 92883, USA.

WHEREAS, Martin Birzle entered into an exclusive Trademark License Agreement, dated August 1, 2013, as amended on February 27, 2015, with Sream, Inc. (hereinafter, the "Trademark License Agreement").  As part of the Trademark License Agreement, Martin Birzle granted Sream, Inc. the exclusive right to use the RooR trademarks (the "Mark" as defined in the Trademark License Agreement) in conjunction with the manufacturing, distribution, and sale of products bearing the Mark in the United States.

WHEREAS, in the above-referenced Trademark License Agreement, Martin Birzle also granted Sream, Inc. the right to enforce the Mark and to sue for past and present infringement of the Mark, including but not limited to the right to compromise, sue for and collect profits and damages. The Trademark License Agreement was subsequently amended on February 27, 2015, and continued for a five year term, from February 27, 2015 onward, with an automatic renewal for another five years.

WHEREAS, on January 8, 2018, Martin Birzle entered into a Trademark Assignment Agreement with RooR International BV, (the "Assignment Agreement") in which he assigned the right, title, and interests in the Mark to RooR International BV.  The Assignment Agreement was recorded with the U.S. Patent and Trademark Office on January 10, 2018. In the Assignment Agreement, Martin Birzle gave RooR International BV the ability to enforce the trademark retroacticely, as well as any and all rights and obligations under any licensing agreements pertaining to the Mark.

WHEREAS, RooR International BV, who is now the registered trademark holder of the Mark, and Sream, Inc. wish to ratify the above-referenced Trademark License Agreement which was previously entered into between Martin Birzle and Sream, Inc.  RooR International BV intends to acknowledge, affirm, and accept such Trademark License Agreement, previously entered into between Martin Birzle and Sream, Inc., upon the terms and conditions as previously agreed to in the above-referenced Trademark License Agreement.

NOW THEREFORE, for the consideration of the benefits to each party in the terms which follow, and for $10.00 the receipt of which is hereby acknowledged, the parties agree as follows:

1. Ratification. RooR International BV hereby accepts the previously executed Trademark License Agreement, and promises to comply with the terms of that Trademark License Agreement.   Moreover, RooR International BV ratifies, adopts, and confirms the

Exhibit D

Trademark License Agreement to the same extent as if RooR International BV had originally executed the Trademark License Agreement.

2. <u>Binding Effect</u>. This Ratification Agreement shall become effective upon the execution of this document. Any and all powers granted by Martin Birzle to Sream, Inc., under the above-referenced Trademark License Agreement, shall be applied from the Date of the above-referenced Trademark License Agreement, going forward.

3. RooR International BV agrees and ratifies that Sream Inc., shall be entitled to compromise, sue for and collect profits and damages based on the enforcement of the RooR Mark, retroactively for past infringement.

IN WITNESS WHEREOF, RooR International BV has duly executed, and Martin Birzle and Sream, Inc. acknowledged, this Ratification Agreement as of the Effective Date.

AGREED TO AND ACCEPTED:

Martin Birzle                              RooR International BV

By: _____ March 7. 2018        By: _____ March 7. 2018
Name: Martin Birzle                     Martin Birzle on behalf of RooR
Am Rosengarten 3,                       International BV
67227 Frankenthal                       Sint Nicolaasstraat 19,
Federal Republic of Germany             1012 NJ,
Email: martin@roor.de                   Amsterdam
        martin@roor.international


Sream, Inc.

By: _____
Jay Farraj on behalf of Sream, Inc.
12825 Temescal Canyon Rd. Ste. B
Corona, CA 92883
USA
Email: jfarraj@sbcglobal.net



12/29/16, 5:29
PM

Exhibit E





12/29/16, 5:30 PM



